**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

ADAM WEST,

                               Plaintiff,

       v.

C. LAGREE,[1] et al.,

                            Defendants.

No. 9:22-CV-00231
(MAD/CFH)

───────────────────────────────

**APPEARANCES:**

Adam West
14-A-5495
Cayuga Correctional Facility
P.O. Box 1186
Moravia, New York 13118
Plaintiff pro se

Attorney General for the
State of New York
The Capitol
Albany, New York 12224
Attorney for defendants

**OF COUNSEL:**

NICHOLAS W. DORANDO, ESQ.
Assistant Attorney General

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff pro se Adam West ("plaintiff"), an inmate who was, at all relevant times, in

the custody of the New York State Department of Corrections and Community

───────────────────

[1] In plaintiff's complaint, he spelled defendant's last name as "Legree." See Compl. at 1-2. In his declaration, defendant clarifies that his last name is spelt "Lagree." See Dkt. No. 50-3 at 1. Accordingly, the Clerk is respectfully directed to correct the case caption to reflect the spelling of defendant's name as "Lagree."

[2] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow C.F."),

brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Sergeant

("Sgt.") Christopher Lagree and Lieutenant ("Lt.") George Murphy (collectively,

"defendants")[3] violated his constitutional rights under the Fourth and Fourteenth

Amendments.  <u>See</u> Dkt. No. 1 ("Compl.").  Presently before the Court is defendants'

motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil

Procedure ("Fed. R. Civ. P.").  <u>See</u> Dkt. No. 50.  Plaintiff opposed, and defendants

replied.  <u>See</u> Dkt. Nos. 56, 58.  For the following reasons, it is recommended that

defendants' motion be granted in part and denied in part.


## I. Background

On review of defendants' motion for summary judgment, the facts will be related

herein in the light most favorable to plaintiff as the nonmoving party.  <u>See</u> <u>Rattner v.

Netburn</u>, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record . . . to determine

whether there is a genuine issue as to any material fact, the court is required to resolve

---

[3] Plaintiff filed his complaint on or about March 7, 2022, also naming John Doe 1, John Doe 2, and John Doe 3 as defendants.  <u>See</u> Dkt. No. 1-2 at 1.  In the more than two years that have passed, plaintiff has not identified the John Doe defendants, and has not served process upon them.  "This failure is not the result of lack of opportunity."  <u>Santiagocruz v. Doe #4</u>, No. 9:21-CV-0806 (TJM/ML), 2023 WL 9600956, at *1 n.1 (N.D.N.Y. Dec. 15, 2023), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u> <u>sub</u> <u>nom.</u> <u>Santiagocruz v. Gordon</u>, 2024 WL 532499 (N.D.N.Y. Feb. 8, 2024).  Plaintiff has had more than two years—far more than the typical 120-day period—to identify and serve defendants John Doe 1, John Doe 2, and John Doe 3, and the Court is under no obligation to extend the deadline indefinitely.  <u>See</u>, <u>e.g.</u>, <u>Thomas v. Keane</u>, 99-CV-4302 (DC), 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve the John Doe defendants within roughly two years of filing complaint); <u>Waldo v. Goord</u>, 97-CV-1385 (LEK/DRH), 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve the John Doe defendants within a year of filing his complaint). It is, therefore, recommended that plaintiff's claims against defendants John Doe 1, John Doe 2, and John Doe 3 be dismissed without prejudice for lack of timely service.

all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

## A. Undisputed Facts[4]

"Plaintiff was housed at [Great Meadow C.F.] from July 1, 2021 until September 27, 2021[.]" Dkt. No. 50-1 at 1, ¶1. "On August 4, 2021, Correction Officer G. Lehoisky ('C.O. Lehoisky') searched [p]laintiff's cell and discovered two photographs which contained gang material in [p]laintiff's possession." Id. at 1, ¶2; see Dkt. No. 50-2 at 3-4, ¶15. "During the search, C.O. Lehoisky observed [p]laintiff swallowing an object that was suspected to be contraband." Dkt. No. 50-1 at 1, ¶3; see Dkt. No. 50-2 at 3-4, ¶15. C.O. Lehoisky subsequently issued plaintiff a misbehavior report, and placed plaintiff on a contraband watch.[5] See Dkt. No. 50-1 at 1-2, ¶¶4-5.

C.O. Lehoisky took plaintiff to Drug Watch Room #1, and strip frisked plaintiff. See Dkt. No. 50-1 at 2, ¶11. "C.O. Lehoisky completed a Report of Strip Frisk on Admission." Id. at 2, ¶12; see Dkt. No. 50-3 at 3, ¶13. "The strip search entailed

---

[4] In support of their motion, defendants filed a Statement of Material Facts. See Dkt. No. 50-1. Plaintiff responded to defendants' Statement, admitting to nearly all of defendants' alleged facts in corresponding paragraphs. See Dkt. No. 56 at 1-3. Thus, to the extent that defendants' Statement of Material Facts is supported by the record, and not otherwise controverted by plaintiff, the Court will deem defendants' facts admitted by plaintiff. See Sledge v. Kooi, 564 F.3d 105, 107 n.2 (2d Cir. 2009) (per curiam) (requiring the plaintiff, "when opposing a motion for summary judgment, to rely not 'upon the mere allegations' of his Complaint, but rather to 'set forth specific facts showing that there is a genuine issue of material fact' through affidavits and reference to discovery, [by] respond[ing] to each of the assertions in [the] statement of material facts with specific reference to the record and 'any facts set forth [therein] shall be deemed admitted unless specifically controverted' " by the plaintiff).

[5] "Under DOCCS' Directive 4910, entitled 'Control of and Search for Contraband,' incarcerated individuals are placed on a contraband watch when there is probable cause to believe that the incarcerated individual ingested or inserted contraband into their body." Dkt. No. 50-1 at 2, ¶6. "Once a determination is made that an incarcerated individual is to be placed on a contraband watch, DOCCS' directive 4910(V)(J) mandates a series of actions to be taken, including a strip frisk." Id. at 2, ¶7. "According to directive 4910(V)(J)(5)(d), all incarcerated individuals are to be subjected to a strip frisk prior to entering the Drug/Special Watch cell." Id. at 2, ¶8. "A strip frisk means a search of an incarcerated individual's clothes and body, including a visual inspection of body cavities." Id. at 2, ¶9. "For a male, this involves a mouth search, running hands through the incarcerated individual's hair, lifting arms to expose his armpits, lifting his testicles to expose the area behind his testicles, and bending over and spreading his buttocks to expose his anus to the frisking officer." Id. at 2, ¶10.

[p]laintiff taking his clothes off and the officers checking his feet, hands, underarms, and the area behind his testicles." Dkt. No. 50-1 at 3, ¶13. "Plaintiff was also required to spread his buttocks and expose his anus." Id. at 3, ¶14. "The searching officers were male and no one except the searching officers were present." Id. at 3, ¶15. "Plaintiff remained in Drug Watch Room 1 until August 11, 2021." Id. at 3, ¶17.

"On August 11, 2021[,] while [p]laintiff was in Drug Watch Room #1, he moved his mattress in front of his cell window, blocking visibility into his cell." Dkt. No. 50-1 at 3, ¶18. "Plaintiff was then moved from Drug Watch Room 1 to Drug Watch Room 2[,] at approximately 3:00 P.M." Dkt. No. 50-6 at 5; see Dkt. No. 50-1 at 3, ¶19. At this time, "C.O. Hall was assigned to Drug Watch Room 2." Dkt. No. 50-1 at 3, ¶20.

"On or about August 12, 2021[,] at about 7:45 A.M., [p]laintiff was in Drug Watch Room 2." Dkt. No. 50-1 at 3, ¶21. That morning, "Sergeant Woodruff directed C.O. Londrigan to search Drug Watch Room 1 for contraband," as plaintiff was just moved out of that room. Id. at 3, ¶22. "C.O. Londrigan searched Drug Watch Room 1 at approximately 7:45AM, and he recovered" two ceramic razor blades "in the right rear comer [sic] of cell under debris, which CO Londrigan secured on his person and finished the search with no more contraband found." Id. at 4, ¶23. As a result, "[p]laintiff was issued an Incarcerated Misbehavior Report ('The August 12 incident'), charging him with the following rule violations: Contraband (113.23), Weapon (113.10), Smuggling (114.10)." Id. at 4, ¶24. "Lt. Owen reviewed the [report], and served it upon [p]laintiff on August 18, 2021, at 12:15 P.M." Id. at 4, ¶25.

"On August 13, 2021, at 4:00 P.M., C.O. Miller observed [p]laintiff defecating on the floor in Drug Watch Room #2, in violation of an express order not to do so." Dkt. No.

50-6 at 6; <u>see</u> Dkt. No. 50-1 at 4, ¶26. "C.O. Miller issued [p]laintiff an Incarcerated

Misbehavior Report ('The August 13 incident') for this incident, charging [p]laintiff with

the following rule violations: Direct Order (106.10) and Unhygienic Act (118.22)." Dkt.

No. 50-6 at 6; <u>see</u> Dkt. No. 50-1 at 4, ¶27. "This Misbehavior Report was also served

on [p]laintiff on August 18, 2021 at 12:15 P.M." Dkt. No. 50-6 at 6; <u>see</u> Dkt. No. 50-1 at

4, ¶28.

"A [disciplinary] hearing was commenced on August 31, 2021 relative to the above-

mentioned misbehavior reports." Dkt. No. 50-1 at 5, ¶33. Prior to the hearing, however,

"[p]laintiff was provided with a Tier Assistant—Tier Assistant DeMarsh—who met with

[p]laintiff on August 20, 2021 at 10:00 A.M." <u>Id.</u> at 4, ¶30. "Tier Assistant DeMarsh

submitted several document[s], evidence, and witness requests on [p]laintiff's behalf[,]"

and "concluded their work on August 24, 2021 after giving [p]laintiff all available

documents and evidence." <u>Id.</u> at 5, ¶¶31-32. Lt. Murphy then conducted plaintiff's Tier

III hearing on August 31, 2021. <u>See id.</u> at 5, ¶¶33-34.

"Following the commencement of the proceeding, the hearing was adjourned and

was re-convened on September 7, 2021, where [Lt.] Murphy reviewed [relevant

evidence]." Dkt. No. 50-1 at 5, ¶35. "The hearing was then adjourned to September 15,

2021, when [Lt. Murphy] received testimony from Officer Hall, at [p]laintiff's request,

relative to the August 12 incident." <u>Id.</u> at 5, ¶36. "Further, [Lt.] Murphy called an

incarcerated individual witness, at [p]laintiff's request." <u>Id.</u> at 5, ¶37. "The [h]earing was

[then, again,] briefly adjourned so [Lt.] Murphy could receive photographic evidence that

[p]laintiff requested." <u>Id.</u> at 5, ¶38.

5

"At each stage in the proceeding, [p]laintiff was present." Dkt. No. 50-1 at 5, ¶39. "While [Lt.] Murphy placed his findings on the record, he also prepared a written form stating the disposition, the evidence relied upon, and the reasons for the sanction imposed, which form was delivered to the [p]laintiff on the record, although he declined to sign the acknowledgment of receipt." Id. at 6, ¶40.

### B. Plaintiff's Disputed Allegations

Plaintiff alleges that, on August 4, 2021, at around 3:00 P.M., he "was ambushed by Sgt. Lagree and other [correctional] officers," who "immediately threw [plaintiff] on the wall to frisk [him]." Dkt. No. 56 at 7; Compl. at 7. The officers then walked plaintiff "into an undisclosed location and [told] him to strip off [his] clothes, which [plaintiff] complied." Compl. at 7. "They searched everywhere humanly possible." Id. They then took plaintiff back to his cell, and they searched his cell "for what seemed like an hour or close to it." Id. Plaintiff observed Sgt. Lagree "whisper to one of the officers." Id. at 8. The officers then escorted plaintiff to "the clinic," where Sgt. Lagree asked plaintiff to consent to an x-ray. Id. Plaintiff declined, explaining that he "did not want to expose [him]self to radiation unless it was for emergency medical records." Id.

Sgt. Lagree thereafter housed plaintiff "inside a dryroom with no sink, toilet nothing but a bed," and the room smelled of feces and had traces of feces on the walls and mattress. Compl. at 8. Sgt. Lagree did not provide plaintiff with an explanation for transferring him to the dryroom, nor did he issue plaintiff a misbehavior report. See id. at 11. Sgt. Lagree told plaintiff that he could leave the dryroom only after "2 clean defecations, & 2 x-rays." Id. at 8. Plaintiff "immediately told [Sgt. Lagree that] clearing 2 x-rays is not part of procedure." Id. Plaintiff thought Sgt. Lagree "was bluffing" and that

6

if he took two clean defecations, he would be released.  Id.  "After about 8 days and 2

defecations[, however, plaintiff] was not released."  Id.

On August 12, 2021, at around 10:00 A.M., plaintiff submitted to an x-ray.  See

Compl. at 8.  Unidentified prison officials told plaintiff that "they [saw] an object in [his]

teeth, for which [plaintiff] explained to them [he] had a metal filling in [his] teeth and to

go speak with dental to confirm."  Dkt. No. 56 at 7.  Officers then took plaintiff back to

the dryroom, where he requested to speak to a lieutenant "to let him know that the

officers were violating [his] rights."  Compl. at 8.  Because the officers did not respond to

plaintiff's request, plaintiff "obscure[d] the view of the cell with the mattress and

demanded to see [a lieutenant]."  Id.  An hour later, a lieutenant arrived at the dryroom

and directed plaintiff to exit.  See id.  After plaintiff complied, Sgt. Woodruff directed a

correctional officer to search the dryroom.  See id.  The officers found no contraband,

but an officer told plaintiff that he needed another x-ray because "they" saw "something

in [his] teeth."  Id.

On August 13, 2021, at around 4:00 P.M., plaintiff "had to defecate" and requested

the observation officer "to bring [him] the bin so [he] could relieve [him]self."  Compl. at

9.  Plaintiff warned the observation officer it was an emergency.  See id.  The

observation officer ignored the warning and told plaintiff to wait fifteen minutes for the

sergeant.  See id.  After waiting ten minutes, "instead of defecting on [him]self," plaintiff

defecated on the floor of the dryroom.  Id.  The sergeant that responded to the incident

directed a correctional officer to issue plaintiff a misbehavior report.  See id.

On August 17, 2021, at around 9:00 A.M., plaintiff submitted to another x-ray.  See

Compl. at 9.  "Just like the time before[, plaintiff] wasn't given [a] radiation suit to prevent

[him] from radiation[.]"  Id.  Although plaintiff was supposed to be released from the dryroom soon after the x-ray, plaintiff was instead escorted to the Special Housing Unit ("SHU") because the officers "found something."  Id.

Plaintiff was issued two misbehavior reports and, thus, was subjected to a disciplinary hearing.  See Compl. at 9-10.  In preparation for his hearing, plaintiff requested video surveillance footage from August 11 and August 12.  See id. at 10.  Although a preservation form indicated that both the August 11 and August 12 videos had been preserved, only the August 12 footage was shown at plaintiff's hearing.  See id.  Lt. Murphy told plaintiff that the August 11 video surveillance footage he requested "was unobtainable," but offered no other explanation.  Id.; see Dkt. No. 56 at 9.  Lt. Murphy also "disregarded . . . facts" during the hearing and relied on false testimony in reaching his determination.  Compl. at 9-11.  Lt. Murphy "eventually sentenced [plaintiff] to 270 days [in the] SHU."  Id. at 9.  However, "that [sentence] was later modified to 180 days after [plaintiff] appeal[ed]" the hearing determination.  Id.

## II.  Legal Standard

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the absence of disputed material facts by citing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c).  A fact is material if it

"might affect the outcome of the suit," as determined by the governing substantive law;

a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 248 (1986).

If the moving party meets this burden, the nonmoving party "must set forth specific

facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 248 (citation

omitted); <u>see</u> <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a

summary judgment motion, the district court . . . must resolve all ambiguities and draw

all reasonable inferences against the movant."  <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>,

352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party cannot rely on "mere

speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment."  <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986) (citing

<u>Quarles v. Gen. Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)); <u>see</u> <u>also</u>

<u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) ("[M]ere conclusory allegations or

denials . . . cannot by themselves create a genuine issue of material fact where none

would otherwise exist.") (citation omitted).

Where a party seeks judgment against a pro se litigant, or a pro se litigant moves for

summary judgment, the Court must afford the pro se litigant special solicitude.  <u>See</u>

<u>Treistman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam).  As

the Second Circuit explained,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," that a pro se
> litigant's submissions must be construed "liberally," and that
> such submissions must be read to raise the strongest
> arguments that they "suggest[.]"  At the same time, our
> cases have also indicated that we cannot read into pro se

> submissions claims that are not "consistent" with the pro se
> litigant's allegations, or arguments that the submissions
> themselves do not "suggest," that we should not "excuse
> frivolous or vexatious filings by pro se litigants," and that pro
> se status "does not exempt a party from compliance with
> relevant rules of procedural and substantive law[]" . . . .

Id. (citations omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, . . . a court is obligated to construe his pleadings liberally.") (citations and quotation marks omitted).

### III. Discussion

Plaintiff alleges that Sgt. Lagree violated his Fourth Amendment rights against unreasonable searches and seizures by forcing him to submit to two x-rays.  See Dkt. No. 56 at 8; see also Compl. at 11.  Plaintiff also brings a Fourteenth Amendment claim against Lt. Murphy, claiming that Lt. Murphy violated his due process rights.  See Dkt. No. 56 at 9; see also Compl. at 10-11.  Defendants move for summary judgment, arguing that "there is not a material dispute of fact."  Dkt. No. 58 at 1.  Specifically, defendants contend that (1) Sgt. Lagree did not violate plaintiff's Fourth Amendment rights; (2) Lt. Murphy provided plaintiff with sufficient process and, thus, did not violate plaintiff's Fourteenth Amendment rights; and (3) Sgt. Lagree and Lt. Murphy are nevertheless entitled to qualified immunity.  See Dkt. No. 50-6 at 8-21.

### A. Procedural Issues

As an initial matter, defendants point out that plaintiff "admits nearly all material facts" in his response to defendants' Statement of Material Facts.  Dkt. No. 58 at 1-2.

Defendants argue that plaintiff's admissions are "fatal" to his Fourth and Fourteenth Amendment claims, as there is not a material dispute of fact.  Id. at 2.

N.D.N.Y. Local Rule 56.1 mandates that the party moving for summary judgment file a Statement of Material Facts setting forth the "material fact[s] about which the moving party contends there exists no genuine issue."  N.D.N.Y. L.R. 56.1(a).  The party opposing a motion for summary judgment must "file a separate Response to the Statement of Material Facts.  The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs."  Id. at 56.1(b).  "Each denial shall set forth a specific citation to the record where the factual issue arises."  Id.; see Lee v. City of Troy, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact."). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y. L.R. 56.1(b); see Douglas v. City of New York, No. 18-CV-9327 (KPF), 2022 WL 294075, at *4 (S.D.N.Y. Feb. 1, 2022).

While "[p]ro se litigants are . . . not excused from meeting the requirements of Local Rule 56.1," the Court retains discretion "to consider the substance of the plaintiff's arguments" even where there is incomplete compliance with the rule.  Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (internal citations omitted); see Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not

required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (internal quotation marks omitted); see also Liverpool v. Davis, 442 F. Supp. 3d 714, 723 (S.D.N.Y. 2020) ("Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion to consider the substance of the plaintiff's arguments.") (internal quotation marks and citations omitted).

Here, as defendants assert, plaintiff admits nearly all facts contained in defendants' Statement of Material Facts. See Dkt. No. 56 at 1-3. Nevertheless, plaintiff also provides additional assertions throughout his opposition papers to argue that there is, indeed, a dispute of material fact. See id. at 1-10. The undersigned recognizes that plaintiff's compliance with Local Rule 56.1 is imperfect. However, in light of special solicitude, and in deference to plaintiff's pro se status, the undersigned will exercise its discretion to conduct "its own assiduous review of the record" for any disputes of material fact. Abraham v. Leigh, 471 F. Supp. 3d 540, 554 (S.D.N.Y. 2020); see FED. R. CIV. P. 56 advisory committee's note to 2010 amendment (noting that when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," "the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute," and "the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant"); see, e.g., Ford v. Deacon, No. 9:16-CV-01001 (MAD/TWD), 2018 WL 5729352, at *9 (N.D.N.Y. Aug. 27, 2018) ("[I]n deference to [the p]laintiff's pro se status, the Court, in the exercise of its discretion, has opted to conduct an assiduous

review of the entire summary judgment record despite [the p]laintiff's failure to comply with the local rule."), report and recommendation adopted, 2018 WL 4501208 (N.D.N.Y. Sept. 20, 2018), aff'd, 793 F. App'x 13 (2d Cir. 2019) (summary order); Sanders v. St. Mary, No. 9:19-CV-1314 (BKS/TWD), 2021 WL 1575944, at *2 (N.D.N.Y. Apr. 22, 2021) ("As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is 'required to resolve all ambiguities and draw all permissible factual inferences' in favor of Plaintiff.") (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)), report and recommendation adopted, 2021 WL 1999781 (N.D.N.Y. May 19, 2021).

Second, defendants also argue that plaintiff raises "for the first time in his opposition [papers,] that the Fourth Amendment violation by [Sgt.] Lagree was forcing [p]laintiff to comply with x-ray imaging."  Dkt. No. 58 at 2.  Defendants contend that plaintiff cannot advance such an argument before the Court because it constitutes a new claim, as "the only Fourth Amendment claim before this Court arose from the allegations that [Sgt.] Lagree escorted [p]laintiff to 'an undisclosed location,' made [him] take off his clothes, and then 'searched everywhere humanly possible' without justification."  Id.  Defendants assert that "[i]nsofar as references to x-ray imagining do exist in the Complaint, the Court reviewed the Complaint in its entirety, liberally construed [p]laintiff's pleadings, and did not find a cause of action as it relates to x-ray imagining" and "[p]lainitff has not moved to amend his complaint to include a claim related to x-rays[.]"  Id.

"A party generally may not assert a cause of action for the first time in response to a summary judgment motion."  Simpson v. Town of Warwick Police Dep't, 159 F. Supp. 3d 419, 440 (S.D.N.Y. 2016) (citations and quotation marks omitted) (collecting cases);

see Lyman v. CSX Transp., Inc., 364 F. App'x 699, 702 (2d Cir. 2010) (summary order) (finding that the district court did not abuse its discretion in declining to consider "new theories of liability" raised for the first time in opposition to summary judgment); see also Mediavilla v. City of New York, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("Because this theory of excessive force is raised for the first time in [the] [p]laintiff's opposition to [the] [d]efendants' motion for summary judgment, [the Court] need not consider it here. It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment.") (citations omitted). "The rule is no different for pro se plaintiffs." King v. Puershner, No. 17-CV-1373 (KMK), 2019 WL 4519692, at *10 (S.D.N.Y. Sept. 19, 2019) (citing Wright v. Jewish Child Care Ass'n of N.Y., 68 F. Supp. 3d 520, 529 (S.D.N.Y. 2014) (holding that even pro se plaintiffs may not assert new claims in opposition to a motion for summary judgment)).

"However, under Federal Rule of Civil Procedure 15(b), the Court may consider claims outside those raised in the pleadings 'so long as doing so does not cause prejudice' to defendants." Simpson, 159 F. Supp. 3d at 440 (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000)). "Accordingly, in contrast to claims that are entirely new, claims that are related to or are mere variations of previously pleaded claims may be raised on a motion for summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced." Id. (citation and internal quotation marks omitted); see also Duling v. Gristede's Operating Corp., 265 F.R.D. 91, 99 (S.D.N.Y. 2010) ("Courts also consider the extent to which the new claims are related to the existing ones and whether a party has had prior notice of a proposed new claim.").

14

Although plaintiff's complaint could have been clearer in articulating a Fourth Amendment claim based upon the x-ray searches, it was nonetheless sufficient to put defendants on notice that plaintiff intended to pursue such an argument.  See Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 89 (2d Cir. 2010) (summary order) ("While Ragusa's complaint might have been clearer in articulating this theory of retaliation, we conclude that it was sufficient to place defendants on notice that she intended to pursue such an argument."); see also Delanuez v. City of Yonkers, No. 20-CV-4476 (PED), 2022 WL 16540682, at *6 (S.D.N.Y. Oct. 28, 2022).  Indeed, plaintiff's complaint specifically alleges that Sgt. Lagree was "violating [plaintiff's] rights" by forcing him to submit to two x-rays because "clearing 2 x-rays is not part of procedure."  Compl. at 8.  Further, plaintiff claimed that Sgt. Lagree failed to give him "a reasonable explanation for why he had to submit to an x-ray" so his "right from unreasonable search and seizures were [sic] . . . violated."  Id. at 11.  These allegations provide Sgt. Lagree with sufficient notice that plaintiff intended to pursue a Fourth Amendment claim based upon the x-ray searches.

Further, defendants would not be prejudiced by the inclusion of plaintiff's Fourth Amendment claim based upon the x-ray searches because such claim arises from a similar nucleus of operative facts and asserts similar legal theories as the Fourth Amendment claim already alleged.  See Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000) ("In determining what constitutes 'prejudice,' [courts] generally consider whether the assertion of the new claim or defense would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the

plaintiff from bringing a timely action in another jurisdiction.'") (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)).  In fact, this claim arises from the same facts that support plaintiff's strip search claim and, although the legal theories are similar as opposed to identical, that is insufficient to establish prejudice.  See Cruz, 202 F.3d at 569 ("In opposing a Rule 15(b) amendment, a party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory.  Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case.") (internal quotation marks and citation omitted); see also Delanuez, 2022 WL 16540682, at *7 (considering the plaintiff's "new" malicious prosecution claim because "[a]lthough [the plaintiff's] complaint could have been clearer in articulating a malicious prosecution claim, it was nonetheless sufficient to put [the d]efendants on notice that he intended to pursue such an argument" and "the [d]efendants would not be prejudiced by the inclusion of [the plaintiff's] malicious prosecution claim").  Accordingly, the undersigned will consider the merits of plaintiff's Fourth Amendment claim based upon the x-ray searches.

### B. Plaintiff's Fourth Amendment Claims

Plaintiff argues that Sgt. Lagree violated his Fourth Amendment rights "from unreasonable search[es] and seizures."  Compl. at 11.  Specifically, plaintiff claims that Sgt. Lagree (1) escorted plaintiff to "an undisclosed location[,] told [him] to strip off [his] clothes," and then "searched everywhere humanly possible"; and (2) forced plaintiff to submit to two x-rays.  Id. at 7-8, 11.

The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[ ] shall not be violated."

U.S. CONST. AMEND. IV.  However, inmates are generally not afforded the same privacy rights as non-inmates because "[l]oss of . . . privacy [is an] inherent incident[ ] of confinement."  Bell v. Wolfish, 441 U.S. 520, 536 (1979); see Perez v. N.Y.S. Dep't of Corr. Servs., No. 9:08-CV-1031 (LEK/RFT), 2010 WL 1235637, at *5 (N.D.N.Y. Mar. 17, 2010), report and recommendation adopted, 2010 WL 1253641 (N.D.N.Y. Mar. 31, 2010), amended, 2010 WL 1608868 (N.D.N.Y. Apr. 20, 2010), aff'd, 448 F. App'x 152 (2d Cir. 2012) (summary order); see also Nash v. McGinnis, 315 F. Supp. 2d 318, 320 (W.D.N.Y. 2004) ("One of the incidents of confinement for a convict is the loss of privacy, which serves the legitimate purpose of retribution as well as the institutional security needs of the prison system. We therefore hold that 'society is not prepared to recognize as legitimate any subjective expectation of privacy that a [convict] might have in his prison cell.'") (quoting Willis v. Artuz, 301 F.3d 65, 69 (2d Cir. 2002)).  As relevant here, it is well established that "inmates retain a limited right to bodily privacy under the Fourth Amendment."  Harris v. Miller, 818 F.3d 49, 57 (2d Cir. 2016); see Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992).  "To state a cognizable privacy claim, an inmate must allege that (1) he exhibited an actual, subjective expectation of bodily privacy, and (2) prison officials lacked sufficient justification to intrude on the inmate's Fourth Amendment rights."  Telesford v. Annucci, 693 F. App'x 1, 3 (2d Cir. 2017) (summary order) (internal quotation marks and citation omitted).

**1. Strip Search**

"There is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment." Vaughn v. Strickland, Nos. 12-CV-02696 (JPO), 2013 WL 3481413, at *4 (S.D.N.Y. July

11, 2013) (internal quotation marks and citation omitted); see Rodriguez v. Dougherty, No. 3:23-CV-1542 (KAD), 2024 WL 1860057, at *5 (D. Conn. Apr. 29, 2024) ("Strip searches, including visual body cavity searches, have been upheld as reasonable when they are related to a legitimate penological interest, even where there is no probable cause for the particular search.") (citing Loving v. Morton, No. 20-CV-11135 (KMK), 2022 WL 2971989, at *7 (S.D.N.Y. July 27, 2022)).  "Nevertheless, 'the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable.'"  Vaughn, 2013 WL 3481413, at *4 (quoting Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), aff'd, 461 F. App'x 18 (2d Cir. 2012) (summary order)).  In assessing reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Bell, 441 U.S. at 558; see Fernandez v. Badami, No. 20-CV-10287 (VB), 2023 WL 2971771, at *5 (S.D.N.Y. Apr. 17, 2023); see also Jones v. Falco, No. 20-CV-3485 (VB), 2022 WL 3668358, at *4 (S.D.N.Y. Aug. 25, 2022).

Here, in his complaint, plaintiff alleges that Sgt. Lagree escorted him to "an undisclosed location[,] told [him] to strip off [his] clothes[,and then] searched everywhere humanly possible."  Compl. at 7-8.  However, in his opposition papers, plaintiff does not appear to challenge the constitutionality of the strip search.  See generally Dkt. No. 56.  In fact, as defendants' argue, plaintiff admits "the procedure of a strip frisk and that the strip frisk he received was substantially in compliance with the procedure."  Dkt. No. 58 at 2; see Dkt. No. 50-1 at 2-3, ¶¶9-15; see also Dkt. No. 56 at 1.  Specifically, "[t]he strip search entailed [p]laintiff taking his clothes off and the officers checking his feet, hands,

underarms, and the area behind his testicles."  Dkt. No. 50-1 at 3, ¶13.  "Plaintiff was also required to spread his buttocks and expose his anus."  Id. at 3, ¶14.  "The searching officers were male and no one except the searching officers were present." Id. at 3, ¶15.  Even liberally construing plaintiff's allegations, there is no indication that this search was done in a humiliating manner, or otherwise conducted in an unreasonable manner unrelated to a legitimate penological concern.  See Smith v. City of New York, No. 14-CV-5934 (JCF), 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) (explaining that, to establish that a strip search was unconstitutional, "the plaintiff must allege facts suggesting that the search did not serve a legitimate penological purpose, but was instead designed to intimidate, harass, or embarrass him, or was an exaggerated response to legitimate concerns") (internal quotation marks and citations omitted); see also Jean-Laurent, 438 F. Supp. 2d at 323 ("Generally, strip searches have been upheld as a reasonable security measure within a correctional facility[,] even in the absence of probable cause[,] as long as they are related to a legitimate penological goal.").

Moreover, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006).  Personal involvement can include "direct participation by the supervisor in the challenged conduct."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003).  Personal involvement by a supervisor can

> also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising

> subordinates who commit unlawful acts, or (4) deliberate
> indifference to the rights of others by failing to act on
> information regarding the unlawful conduct of subordinates.

Id.

Here, Sgt. Lagree declares that "[u]pon review of paperwork completed at the time of [p]laintiff's strip frisk, [he] would not have been present . . . because [he] was the administrative sergeant for the facility at the time and was responsible for supervising [a] shift change," which "required [him] to be present at the front desk for employee frisks." Dkt. No. 50-3 at 3-4, ¶15. In response, plaintiff admits that he is "unsure" whether Sgt. Lagree was actually present during the strip search. Dkt. No. 56 at 2, ¶16; see Dkt. No.50-1 at 3, ¶16. In fact, plaintiff offers no facts to indicate that Sgt. Lagree was personally involved in the August 4, 2021, strip search. See Moore v. Albany Cnty., No. 9:19-CV-630 (TJM/TWD), 2022 WL 4133205, at *6 (N.D.N.Y. Sept. 12, 2022) (granting the defendant's motion for summary judgment because the "[p]laintiff ha[d] offered no evidence of any involvement of [the d]efendant" in the strip search), appeal dismissed (Apr. 11, 2023). It is, therefore, recommended that plaintiff's Fourth Amendment claim against Sgt. Lagree based upon the strip search be dismissed.

## 2. X-Ray Searches

The Supreme Court has repeatedly held that prison officials "must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 328 (2012). "The task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials.'" Id. (quoting Bell, 441 U.S. at 548). Thus, "in the absence of

substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827 (1974). Applying this framework, the Southern District of New York has held that a prisoner's rights are not violated by x-ray searches conducted pursuant to a reasonable prison policy. See Larkins v. Bartlett, No. 88-CV-8169 (MBM), 1990 WL 1488, at *2-3 (S.D.N.Y. Jan. 8, 1990); see also Manley v. Ramos, No. 13-CV-2662, 2014 WL 1496094, at *2 (S.D.N.Y. Apr. 16, 2014) (dismissing the inmate plaintiff's Fourth Amendment claim based on x-ray searches because "the mere existence of searches pursuant to a prison policy without an allegation that the searches [were] an exaggerated response to security concerns is insufficient to show that the search violated [the plaintiff's] constitutional rights").

Here, plaintiff claims that Sgt. Lagree violated the Fourth Amendment when he forced plaintiff to submit to two x-rays. See Dkt. No. 56 at 8. Specifically, plaintiff argues that he "ha[s] the right to deny x-ray[s] and to only comply with a search of 3 defecations [because t]he normal standard for dryroom entry is the search of 3 defecations." Id. Plaintiff further alleges that "there were [sic] never any suspicion that [he] swallowed anything, . . . therefore there should have never been no x-rays demanded." Id. at 4. Defendants argue that "'because x-ray searches are less invasive than a strip search . . . a prisoner's rights are not violated by x-ray searches conducted pursuant to a reasonable prison policy.'" Dkt. No. 58 at 3 (quoting Manley, 2014 WL 1496094, at *2). However, defendants have not further elaborated. Specifically, defendants have not articulated the "reasonable prison policy" that was in place at Great Meadow C.F. that subjected plaintiff to the x-ray searches. Manley, 2014 WL 1496094,

at *2; see Larkins, 1990 WL 1488, at *2-3 (holding that an x-ray examination of the inmate plaintiff did not violate his Fourth Amendment privacy rights because the State had a legitimate interest in preventing the introduction of contraband into the prison). Defendants also have not stated whether there was reasonable suspicion for the x-ray searches, or otherwise provided any facts as to the manner in which the x-ray searches were conducted.  Cf. Spencer v. Roche, 659 F.3d 142, 147 (1st Cir. 2011) (dismissing the plaintiff's Fourth Amendment claim because "police may be justified in compelling a suspect to submit to an x-ray search of a part of his body" where "there is no evidence that the x-ray was carried out in a dangerous or otherwise inappropriate manner" and "the imaging was performed by trained professionals in a hospital setting"); United States v. Vega-Barvo, 729 F.2d 1341, 1349 (11th Cir. 1984) ("[W]e recognize that if not performed properly, an x-ray can be dangerous.").  Notably, defendants have not referred to the x-ray searches in their Statement of Material Facts.  See generally 50-1; see also United States v. Oyekan, 786 F.2d 832, 837-38 (8th Cir. 1986) ("[A] reasonable suspicion that a person is an alimentary canal smuggler may justify an involuntary x-ray examination . . . the crucial question is whether the government has shown 'articulable facts which are particularized as to the person and as to the place to be searched.'") (quoting Vega-Barvo, 729 F.2d at 1349).  Thus, although a prison x-ray search may pass Fourth Amendment muster, defendants have not sufficiently established the circumstances of the search.  See Hernandez v. Tulare Cnty. Correction Ctr., No. 1:16-CV-00413 (EPG/PC), 2018 WL 4501113, at *5 (E.D. Cal. Sept. 18, 2018) ("[T]he Court concludes that the x-ray search is reasonable under the Fourth Amendment" given that "[t]he x-ray search was minimally intrusive in both manner and scope"; "[p]laintiff was

22

fully clothed"; "[j]ail officials did not instruct him to expose his genitals or buttocks" and they "did not touch him"; and "the purpose of the routine visual inspection is to ensure that prisoners do not bring weapons or other contraband into the jail facility"). In light of special solicitude, given that plaintiff argues "there were [sic] never any suspicion that [he] swallowed anything," there appears to remain a genuine issue of fact as to the purpose and circumstances of the x-ray searches. Dkt. No. 56 at 4. It is, therefore, recommended that defendants' motion for summary judgment on plaintiff's Fourth Amendment claim based on the x-ray searches be denied.

### C. Plaintiff's Fourteenth Amendment Claim

Plaintiff claims that Lt. Murphy violated his Fourteenth Amendment rights. See Compl. at 9-11. Plaintiff argues that (1) he "was not given a fair hearing" because "not allowing crucial . . . evidence at [his disciplinary] hearing is a violation of [his] due process [rights]"; (2) Lt. Murphy's decision was not supported by sufficient evidence; and (3) Lt. Murphy "failed to completely record the full tier hearing in its entirety." Dkt. No. 56 at 6, 9; Compl. at 11. Defendants contend that Lt. Murphy "complied with the due process requirements, and his determination was supported by the record." Dkt. No. 50-6 at 6. Defendants specifically argue that plaintiff's Fourteenth Amendment claim fails because (1) plaintiff cannot establish a protected liberty interest, and (2) plaintiff was nevertheless afforded sufficient process. See id. at 8-16.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices." Wilkinson v. Austin, 545 U.S.

209, 221 (2005) (citation omitted).  "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."  Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted). To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004); see also Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir. 2000); Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998).

**1. Liberty Interest**

"To state a claim for procedural due process, there must first be a liberty interest which requires protection."  Tavares v. Amato, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) (citations omitted).  "An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995)."  Lewis v. Murphy, No. 9:12-CV-00268 (NAM), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014).  "Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Gibson v. Rosati, No. 9:13-CV-00503 (GLS/TWD), 2017 WL 1534891, at *9 (N.D.N.Y. Mar. 10, 2017) (quoting Sandin, 515 U.S. at 783-84) (additional citations omitted), report and recommendation adopted, 2017 WL 1512371 (N.D.N.Y. Apr. 27, 2017).

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first <u>Sandin</u> factor." <u>Liao v. Malik</u>, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u>, 2016 WL 1122069 (N.D.N.Y. Mar. 22, 2016). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. <u>Vasquez v. Coughlin</u>, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

"The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement." <u>McKelvey v. Fischer</u>, No. 9:12-CV-0094 (LEK/TWD), 2013 WL 3475448, at *8 (N.D.N.Y. July 10, 2013) (citing <u>J.S. v. T'Kach</u>, 714 F.3d 99, 106 (2d Cir. 2013)); <u>see</u> <u>Davis v. Barrett</u>, 576 F.3d 129, 133-34 (2d Cir. 2009). "Thus, while not dispositive, the duration of a disciplinary confinement is a significant factor in determining atypicality." <u>Gibson</u>, 2017 WL 1534891, at *10 (citing <u>Colon v. Howard</u>, 215 F.3d 227, 231 (2d Cir. 2000)). "The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined." <u>Gibson</u>, 2017 WL 1534891, at *10 (citing <u>Palmer v. Richards</u>, 364 F.3d 60, 64 (2d Cir. 2004)). Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." <u>Bunting v. Nagy</u>, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting

Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).  By contrast, 305 days or more of

segregated confinement has been deemed an atypical and significant hardship.  See

Colon, 215 F.3d at 231-32.  "A period of confinement between 101 and 305 days is

considered to be an 'intermediate duration' and could implicate a liberty interest should

a detailed record of the conditions of confinement indicate that it was an atypical and

significant hardship."  Bunting, 452 F. Supp. 2d at 456 (citing Sealey, 197 F.3d at 589).

    Here, it appears that plaintiff was in the SHU for 270 days.  See Compl. at 10; see

also Dkt. No. 50-6 at 10.  Liberally construing plaintiff's submissions, he claims to have

suffered "mental anguish, emotional distress, and degradation," as a result of his

confinement.  Compl. at 12.  However, plaintiff has not further elaborated on the

conditions of his SHU confinement during the period in question.  See generally id.  In

fact, the record includes no evidence suggesting that plaintiff's SHU confinement

imposed "an atypical and significant hardship on [him] in relation to the ordinary

incidents of prison life."  Sandin, 515 U.S. at 484.  "Several other courts, when similarly

faced with the absence of any record evidence showing an atypical and significant

hardship resulting from SHU confinement of between 101 and 305 days, have declined

to find the existence of a liberty interest."  Genier v. Vanarnum, No. 9:13-CV-1460

(GTS/DEP), 2016 WL 4507456, at *6 (N.D.N.Y. June 20, 2016) (collecting cases),

report and recommendation adopted, 2016 WL 4508354 (N.D.N.Y. Aug. 26, 2016); see,

e.g., Henry v. Dinelle, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *10

(N.D.N.Y. Nov. 29, 2011) (dismissing due process claim where the plaintiff "failed to

adduced [sic] admissible record evidence from which a rational factfinder could

conclude that the conditions of his confinement during this 150-day period were more

26

severe than normal SHU conditions"); Dawkins v. Gonyea, 646 F. Supp. 2d 594, 606-07 (S.D.N.Y. 2009) ("Because Dawkins failed to make any allegations detailing the conditions of his confinement in SHU, and because the [280-day] duration of his confinement was shorter than confinements that courts in this Circuit have deemed sufficient to impose per se atypical or significant hardship, the Court finds that Dawkins has not pled a cognizable liberty interest."); Black v. Selsky, 15 F. Supp. 2d 311, 314-16 (W.D.N.Y. 1998) (concluding that the plaintiff's "confinement in SHU for 180 days does not present the type of atypical and significant deprivation in which a state may conceivably create a liberty interest" where there was no accompanying record evidence showing restrictions "greater than the restrictions imposed on the inmate in Sandin").  Thus, plaintiff has not raised a triable dispute of fact as to whether the 270 days of SHU confinement was an atypical hardship under Sandin.  See Carter v. Carriero, 905 F. Supp. 99, 103-04 (W.D.N.Y. 1995) (concluding that 270 days of SHU confinement did not impose a per se "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" such that the failure to allow the plaintiff to call a witness at a disciplinary hearing giving rise to his confinement did not trigger a liberty interest).  Accordingly, plaintiff lacks a protected liberty interest sufficient to raise a Fourteenth Amendment procedural due process claim.  See Blackshear v. Woodward, No. 9:13-CV-1165 (FJS/CFH), 2014 WL 2967752, at *6-7 (N.D.N.Y. July 1, 2014).  It is, therefore, recommended that plaintiff's Fourteenth Amendment claim against Lt. Murphy be dismissed.

### 2. Procedural Due Process

The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." Sira, 380 F.3d at 69 (citation and internal quotation marks omitted).  "The constitutionally mandated due process requirements include:"

> (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense.

Payne v. Coburn, No. 9:15-CV-00392 (GLS/TWD), 2017 WL 4330372, at *11 (N.D.N.Y. Aug. 29, 2017) (citing Wolff v. McDonnell, 418 U.S. 539, 564-70 (1974), and Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004)), report and recommendation adopted, 2017 WL 4326079 (N.D.N.Y. Sept. 27, 2017).

"Since Wolff, the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by 'some evidence.'"  Sira, 380 F.3d at 69 (quoting Superintendent v. Hill, 472 U.S. 445, 455 (1985)).  "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling."  Id. (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)).  Nevertheless, as the Second Circuit has explained, "the 'some evidence' standard requires some 'reliable evidence.'"  Id. (quotation and other citation omitted).

As defendants argue, even if plaintiff established a protected liberty interest, his due process claim still fails.  See Dkt. No. 50-6 at 10-16.  First, plaintiff argues that he "was not given a fair hearing" because Lt. Murphy failed to introduce "crucial" video evidence

that plaintiff requested.  Dkt. No. 56 at 6, 9.  However, the record shows that Lt. Murphy

attempted to obtain such video, but the video was "unattainable."  Dkt. No. 50-4 at 30.

Specifically, Lt. Murphy declares that he "adjourned th[e] matter to conduct an inquiry

and obtain the requested video [but t]he video . . . was unavailable" and Lt. Murphy

"informed [plaintiff] on the record."  Dkt. No. 50-4 at 7, ¶33; see Girard v. Chuttey, 826 F.

App'x 41, 45-46 (2d Cir. 2020) (summary order) (finding that the plaintiff "did not

establish a genuine dispute of fact as to whether the defendants withheld [video]

evidence in violation of his constitutional rights" where "the defendants presented

evidence that no . . . footage existed, and [the plaintiff] never supported his claim that

there was . . . footage with an affidavit or other evidence"); see also Benitez v. Locastro,

No. 9:04-CV-423 (NAM/RET), 2010 WL 419999, at *15 (N.D.N.Y. Jan. 29, 2010)

("Plaintiff alleges that [the defendant's] failure to produce a videotape of the November

8, 2001 incident at Clinton violated his due process rights. The record shows that [the

defendant] attempted to obtain the video, but was informed of its unavailability[; thus,

the defendant] did not violate [the p]laintiff's due process rights when he [stated] that the

videotape was unavailable.") (citations omitted).  Given Lt. Murphy's declaration, and an

absence of evidence from plaintiff, "[t]he record here establishes that the additional

video evidence [p]laintiff sought was not available and 'where the requested [evidence

is] found to be nonexistent, the inmate suffers no constitutional deprivation.'"  Girard v.

Cuttle, No. 9:15-CV-0187 (TJM/DJS), 2018 WL 4190140, at *10 (N.D.N.Y. Aug. 10,

2018) (quoting Mohamed v. Phelix, No. 9:14-CV-01389 (TJM/TWD), 2017 WL 4326660,

at *12 (N.D.N.Y. June 13, 2017), report and recommendation adopted, 2017 WL

4326520 (N.D.N.Y. Sept. 28, 2017)), report and recommendation adopted sub nom.

Girard v. Chuttey, 2018 WL 4188431 (N.D.N.Y. Aug. 31, 2018), aff'd, 826 F. App'x 41 (2d Cir. 2020) (summary order); see Molano v. Bezio, 42 F. Supp. 3d 465, 468-69 (W.D.N.Y. 2012) (holding that "[the defendant-hearing officer's] refusal to order the production of [a surveillance tape], if any, does not amount to a denial of due process" where "[t]here is no proof that a surveillance videotape . . . existed at the time [the] plaintiff requested it"); see also Allen v. Graham, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *15 (N.D.N.Y. Sept. 26, 2017) ("Plaintiff's argument that defendant Vasile should have reviewed security video leading up to the incident does not raise a due process issue. As he explained during the hearing, defendant Vasile concluded that there was no relevant video footage available."), report and recommendation adopted, 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017).

Moreover, Lt. Murphy declares that even if such video existed, it would be irrelevant because "the video would have depicted [a] cursory search of Drug Watch Room 2, not the Drug Watch Room 1, where the contraband was found."  Dkt. No. 50-4 at 7, ¶34. Although plaintiff asserts that the video evidence is "crucial," he fails to specifically explain its relevance.  Dkt. No. 56 at 9.  Specifically, plaintiff generally argues that the video "would have extremely impacted [his] case," but does not otherwise establish any prejudice resulting from the lack of video footage.  Id. at 6; see Purcelle v. Thomas, No. 9:18-CV-77 (GLS/TWD), 2020 WL 1516421, at *13 (N.D.N.Y. Mar. 6, 2020) ("Even assuming [the defendant's] failure to secure the requested video constituted a procedural deficiency, [the p]laintiff has not sufficiently established any prejudice resulting from the lack of video footage," as the "[p]laintiff's claims are too speculative to establish the video footage would have affected the outcome of the disciplinary

hearing") (citation omitted), report and recommendation adopted, 2020 WL 1511079 (N.D.N.Y. Mar. 30, 2020).  Thus, contrary to plaintiff's contentions, the fact that this video, if it existed, was not produced at plaintiff's disciplinary hearing is not a violation of his due process rights.  See Kalwasinski v. Morse, 201 F.3d 103, 109 (2d Cir. 1999) ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.") (citing Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991)).

    Second, plaintiff contends that Lt. Murphy's decision at the conclusion of the disciplinary hearing was not supported by sufficient evidence.  See Compl. at 11. However, the record indicates that Lt. Murphy relied upon the following evidence presented at the hearing to render his decision: the written statement of C.O. Londrigan; the verbal testimony of C.O. Londrigan; the written statement of C.O. Miller; the verbal testimony of C.O. Miller; the written statement of Sgt. Woodruff; the verbal testimony of Sgt. Woodruff; the written statement of Lt. Mulligan; the verbal testimony of C.O. Hall; the video evidence showing C.O. Londrigan search Drug Watch Room 1; the video evidence of plaintiff admitting to defecating on the cell floor; the testimony of another inmate in which he states that Drug Watch cells are always thoroughly cleaned out before another inmate is allowed to occupy them; as well as the photographs of the weapon that was found.  See Dkt. No. 50-4 at 55; see also Dkt. No. 50-6 at 14.  "As the hearing officer, [Lt. Murphy] was authorized to make an independent assessment of all the evidence."  Allen, 2017 WL 9511168, at *15.  Therefore, contrary to plaintiff's assertions, Lt. Murphy's decision was sufficiently supported by "some evidence." Purcelle, 2020 WL 1516421, at *14 ("As [the defendant-hearing officer] relied on testimony from an officer present for the incident, his determination was supported by

'some evidence' and did not violate [the p]laintiff's due process rights."); see Alexander v. Fischer, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *6 (N.D.N.Y. Dec. 21, 2015) ("The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is 'some' or 'a modicum' of evidence to support the hearing officer's determination.") (quoting Sira, 380 F.3d at 76), report and recommendation adopted, 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016).

Third, plaintiff also claims that Lt. Murphy "failed to completely record the full tier hearing in its entirety." Dkt. No. 56 at 9; see Dkt. No. 56 at 6. However, a failure "to completely record the full tier hearing in its entirety" would "not deprive [p]laintiff of any minimum requirements of due process." Id. at 9; Scott v. Frederick, No. 9:13-CV-605, 2015 WL 127864, at *15 (N.D.N.Y. Jan. 8, 2015) (citation omitted); see Ramsey v. Goord, 661 F. Supp. 2d 370, 393 (W.D.N.Y. 2009) ("[E]ven if [the d]efendants failed to record a portion of [the p]laintiff's disciplinary hearing, such failure does not rise to a due process violation"). Indeed, "the only process due an inmate is that minimal process guaranteed by the Constitution as outlined in Wolff." Ramsey, 661 F. Supp. 2d at 393 (quoting Shakur v. Selsky, 391 F.3d 106, 119 (2d Cir. 2004)). "Significantly, Wolff did not include electronic recording of a disciplinary hearing among the due process requirements." Id.; see Moore v. Griffin, No. 9:13-CV-616 (FJS/TWD), 2015 WL 5330366, at *12 (N.D.N.Y. Sept. 11, 2015) ("Due process does not require that proceedings be recorded."); see also Mitchell v. New York, No. 9:14-CV-0934 (TJM/DEP), 2015 WL 13019618, at *5 (N.D.N.Y. Mar. 11, 2015) (same).

Thus, even if plaintiff had established protected liberty interest, he did not demonstrate that he was denied sufficient process.  Accordingly, it is recommended that plaintiff's Fourteenth Amendment claim against Lt. Murphy be dismissed.

### D. Qualified Immunity

Defendants argue that, even if plaintiff's claims are substantiated, they are entitled to qualified immunity.  See Dkt. No. 50-6 at 19-21.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

As for plaintiff's claim against Lt. Murphy, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See supra Subsection

III.C.  As there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation by Lt. Murphy.  See Aiken, 236 F. Supp. 2d at 230; see also Smith v. Sullivan, No. 9:20-CV-659 (DNH/CFH), 2023 WL 3727447, at *19 (N.D.N.Y. May 3, 2023) ("Here, the Court need not address qualified immunity as an alternative ground to [the] defendants' summary judgment motion because [the] plaintiff has not established a dispute of material fact as to whether [the] defendants violated his constitutional rights."), report and recommendation adopted, 2023 WL 3722137 (N.D.N.Y. May 30, 2023).

As for plaintiff's claim against Sgt. Lagree, as discussed above, there remains a genuine dispute of fact as to plaintiff's allegations surrounding the x-ray searches.  See supra Subsection III.B.  The undersigned thus cannot determine as a matter of law on this record whether Sgt. Lagree is entitled to qualified immunity on plaintiff's Fourth Amendment claim.  See Zwick v. Town of Cheektowaga, No. 17-CV-00727 (FPG), 2021 WL 4895106, at *6 n.7 (W.D.N.Y. Oct. 20, 2021) ("[G]iven the existence of a genuine issue of material fact, the Court will not address the viability of any qualified-immunity defense.") (citing Tolan v. Cotton, 572 U.S. 650, 656 (2014)); see also Davila v. Messier, No. 3:13-CV-81 (SRU), 2014 WL 4638854, at *10 (D. Conn. Sept. 17, 2014) ("The court has identified a genuine issue of material fact with regard to the Fourth Amendment claim alleging an unreasonable strip search. Until the factual dispute about what [the defendant] actually did is resolved by the trier of fact, the court cannot determine whether [qualified immunity applies.]"); Tatum v. City of New York, No. 06-CV-04290 (BSJ/GWG), 2009 WL 124881, at *11 (S.D.N.Y. Jan. 20, 2009) ("Dismissal

34

on the basis of a qualified immunity defense is inappropriate where there are facts in dispute that are material to a determination of reasonableness.").

## IV. Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 50) be **DENIED IN PART** insofar as it seeks dismissal of plaintiff's Fourth Amendment claim against Sgt. Lagree based upon the x-ray searches; and it is further

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 50) be **GRANTED IN PART** and that plaintiff's remaining claims be **DISMISSED**; and it is

**RECOMMENDED**, that the John Doe defendants be **DISMISSED** from this action without prejudice, due to plaintiff's failure to identify and/or serve these defendants; and it is further

**ORDERED**, that the Clerk amend the case caption to correct the spelling of defendant's last name as Lagree; and it is

**ORDERED**, that the Clerk serve a copy of this Report Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to U.S.C. § 636(b)(1) and Local Rule 72.1(c), that the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette,

984 F.2d 85, 89 (2d Cir. 1993) (citing <u>Small v. Secretary of Health and Human Servs.</u>,

892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §636(b)(1); FED R. CIV P. 6(a), 6(e), 72.[6]

        Dated: June 10, 2024
             Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[6] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).